UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x

SHLOMO BAR-AYAL,

                    Plaintiff,

                                        03 CV 9905 (KMW)

          -against-                     ORDER


TIME WARNER CABLE INC.,


                    Defendant.
----------------------------------x

WOOD, U.S.D.J.:

## I. Overview

     Plaintiff Shlomo Bar-Ayal, individually and on behalf of a
putative class, brings this action against defendant Time Warner
Cable, Inc., to recover damages Plaintiff alleges he (and other
class members) suffered as a result of what he claims to be
Defendant's "unlawful practice of levying certain customers with
additional charges above its itemized rate for cable television
and Internet access services, and failing or refusing to refund
those charges."  Am. Compl. ¶ 1.  Specifically, Plaintiff claims
that Defendant unlawfully collected from him and other similarly
situated consumers "franchise fees" that amounted to five percent
of all billed services provided by Defendant, including cable
television services and Internet access, when Internet access
services should not have been included in the calculation of the
franchise fee.  Defendant has moved to stay proceedings and

1

compel arbitration, and has also moved, in the alternative, to dismiss to action.  For the reasons stated below, Defendant's motion to stay the proceedings and compel arbitration is granted.

## II. Background

Plaintiff makes the following allegations in his Amended Class Action Complaint.  Plaintiff, a resident of the State of New York and the County of New York, was and continues to be, from July 2001 through the present, a subscriber to Time Warner Cable[1]'s cable television service as well as its Internet access service marketed under the "Road Runner" brand (hereinafter the

---

[1] Although Plaintiff named Time Warner Cable Inc. as the defendant, Time Warner NY Cable Inc. has appeared, claiming that the New York City cable system to which Plaintiff subscribed is currently owned and operated by Time Warner NY Cable Inc., which does business as TWCNYC, and is a successor in interest to Time Warner Cable Inc.  See Defendant's Memorandum of Law in Support of Time Warner NY Cable's Motion to Stay Proceedings and Compel Arbitration 1 n.1.  Time Warner NY Cable Inc. is a wholly-owned subsidiary of Time Warner Cable Inc.  See Disclosure Statement of Time Warner NY Cable Inc. Pursuant to Fed. R. Civ. P. 7.1(a).  Time Warner NY Cable Inc. has not made a motion to be substituted for Time Warner Cable Inc. as the defendant in this action; therefore, the action will continue against the original party.  See Fed. R. Civ. P. 25(c) ("In case of any transfer of interest, the action may be continued by or against the original party, unless the court upon motion directs the person to whom the interest is transferred to be substituted in the action or joined with the original party."); Charles A. Wright, Arthur R. Miller, and Mary Kay Kane, 7C Federal Practice and Procedure § 1958 (2d ed. 1986) ("The most significant feature of Rule 25(c) is that it does not require that anything be done after an interest has been transferred. The action may be continued by or against the original party, and the judgment will be binding on his successor in interest even though he is not named.").

"Road Runner Internet service"). For the period from July 2001

through March 2002, in its monthly billing, Defendant billed

Plaintiff for cable television services and Internet access

services, and added "franchise fees" amounting to five percent of

all of those billed services.[2] In March 2002, the Federal

Communications Commission (the "FCC") issued a declaratory

ruling, holding that, for the purpose of the Communications Act

of 1934, 47 U.S.C. §§ 151 et seq., as amended by the

Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat.

56 (1996), a high-speed Internet access service offered through a

cable system - i.e., a cable-modem service - is "properly

classified as an interstate information service, not as a cable

service, and that there is no separate offering of

telecommunications service," and concluding that "revenue from

---

[2] A "franchising authority," often a local or municipal
authority, grants cable operators franchises "to authorize the
construction of a cable system over public rights-of-way, and
through easements." 47 U.S.C. § 541 (a)(2). "[A]ny cable
operator may be required under the terms of any franchise to pay
a franchise fee," 47 U.S.C. § 542(a), defined as "any tax, fee,
or assessment of any kind imposed by a franchising authority or
other governmental entity on a cable operator or cable
subscriber, or both, solely because of their status as such," id.
§ 542(g)(1); but "[f]or any twelve-month period, the franchise
fees paid by a cable operator with respect to any cable system
shall not exceed 5 percent of such cable operator's gross
revenues derived in such period from the operation of the cable
system to provide cable services," id. § 542(b) - where "cable
service" is defined as "the one-way transmission to subscribers
of (i) video programming, or (ii) other programming service, and
. . . subscriber interaction, if any, which is required for the
selection or use of such video programming or other programming
service." 47 U.S.C. § 522(6).

cable modem service would not be included in the calculation of gross revenues from which the franchise fee ceiling is determined."  In the Matter of Inquiry Concerning High-Speed Access to the Internet Over Cable and Other Facilities, Declaratory Ruling and Notice of Proposed Rulemaking, 17 F.C.C.R. 4798, ¶ 7, ¶ 105 (2002) ("FCC 2002 Order").

Between March 2002 and June 2002, Defendant continued to collect from Plaintiff franchise fees equivalent to five percent of all billed services, including Internet access services.  In June 2002, Defendant decreased the franchise fee charged to Plaintiff to an amount equivalent to five percent of billed cable television services.  Defendant did not refund to Plaintiff the franchise fees in excess of five percent of billed cable television services that Defendant collected from Plaintiff until June 2002.  Plaintiff alleges that, upon information and belief, Defendant similarly collected and did not refund such excess franchise fees to other subscribers in New York City and throughout the United States.

The class on whose behalf Plaintiff seeks to bring this action is comprised of "all persons who (i) subscribed to the Road Runner Service or any other Internet access service provided by Time Warner Cable and (ii) were assessed 'franchise fees' or other surcharges or taxes on total amounts billed for cable television services and Internet access services combined."  Am.

Compl. ¶ 8.[3]

Based on the allegations described above, in his Amended
Complaint, Plaintiff brings claims against Defendant for:
violation of the Communications Act of 1934, 47 U.S.C. § 542;
violation of the Communications Act of 1934, 47 U.S.C. § 206;
violation of the Internet Tax Freedom Act, reproduced at 47
U.S.C. § 151 note § 1101, and the Communications Act of 1934, 47
U.S.C. § 206; breach of contract; restitution; and deceptive
practices in violation of New York's General Business Law § 349.
Plaintiff asks that this action be certified as a class action
pursuant to Rule 23(c) of the Federal Rules of Civil Procedure,
and seeks, on behalf of himself and the class, damages on each of
the counts alleged (as well as a declaration that Defendant has
committed violations of the federal and state statutes as
alleged), pre-judgment interest, and costs and expenses including
attorneys' fees.

Defendant moves to stay proceedings and compel arbitration
(and also moves, in the alternative, to dismiss the action).

---

[3] The undersigned and her spouse have opted out of any class
that may be certified in this action and waived any right to
recover based on any claim set forth in this action.  See Opt Out
and Stipulation dated May 16, 2006 (Docket # 29).  By Order dated
May 16, 2006, I stated that I believe that I am not required to
recuse myself from this case, but that if any party believes that
there is cause for me to recuse myself, that party should write
to my Courtroom Deputy by May 24, 2006.  No such letters have
been received.

## III. Discussion

### A. Issues as to Arbitrability – Generally

"[T]he Federal Arbitration Act (the 'FAA') creates a 'body of federal substantive law of arbitrability' applicable to arbitration agreements . . . affecting interstate commerce." Alliance Bernstein Inv. Research & Mgmt., Inc. v. Schaffran, 445 F.3d 121, 125 (2d Cir. 2006) (quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983)).[4]  Under Section

---

[4] Both parties assume, without discussion, that the FAA applies to the alleged arbitration agreement at issue here.  The FAA refers to contracts "evidencing a transaction involving commerce," 9 U.S.C. § 2, and defines commerce as, inter alia, "commerce among the several States," 9 U.S.C. § 1.  The Supreme Court has "interpreted the term 'involving commerce' in the FAA as the functional equivalent of the more familiar term 'affecting commerce' – words of art that ordinarily signal the broadest permissible exercise of Congress' Commerce Clause power." Citizens Bank v. Alafabco, Inc., 539 U.S. 52, 56 (2003).  The Court has further concluded that, "[b]ecause the statute provides for 'the enforcement of arbitration agreements within the full reach of the Commerce Clause,' Perry v. Thomas, 482 U.S. 483, 490, 107 S.Ct. 2520, 96 L. Ed. 2d 426 (1987), it is perfectly clear that the FAA encompasses a wider range of transactions than those actually 'in commerce' – that is, 'within the flow of interstate commerce,' Allied-Bruce Terminix Cos.[v. Dobson, 513 U.S. 265], 273, 115 S.Ct. 834[, 130 L.Ed.2d 753 (1995)] (internal quotation marks, citation, and emphasis omitted)." Citizens Bank, 539 U.S. at 56.  Moreover, the FAA applies even if the individual transaction, "taken alone, did not have a substantial effect on interstate commerce," id. (internal quotation marks and citation omitted), because "Congress' Commerce Clause power 'may be exercised in individual cases without showing any specific effect upon interstate commerce' if in the aggregate the economic activity in question would represent 'a general practice . . . subject to federal control,'" id. at 56-57 (quoting Mandeville Island Farms, Inc. v. American Crystal Sugar Co., 334 U.S. 219, 236 (1948)).  See, e.g., Citizens Bank, 539 U.S. at 57-58 (finding that the FAA applies to debt-restructuring agreements executed by Alabama residents in Alabama because, inter alia,

2 of the FAA, "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract [or] transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "Section 2 is 'a congressional declaration of a liberal federal policy favoring arbitration agreements[.]'" <u>Genesco, Inc. v. T. Kakiuchi & Co., Ltd.</u>, 815 F.2d 840, 844 (2d Cir. 1987) (quoting <u>Moses H. Cone Mem'l Hosp.</u>, 460 U.S. at 24). The FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts <u>shall</u> direct the parties to proceed

_____

"[n]o elaborate explanation is needed to make evident the broad impact of commercial lending on the national economy or Congress' power to regulate that activity pursuant to the Commerce Clause"); <u>Adams v. Suozzi</u>, 433 F.3d 220, 226 (2d Cir. 2005) (noting that Congress's "power [under the Commerce Clause] extends to ostensibly intrastate economic activity that has a cumulative substantial effect on interstate commerce" and finding that the FAA applied to an employment agreement – signed by the County of Nassau and the Nassau County Sheriff Officers Association, and affecting "the wages, pensions, and job security of public employees" - because "no extended discussion is required to show that [such] employment agreements 'evidence[] a transaction involving commerce,' 9 U.S.C. § 2") (footnote omitted).

In this case, as discussed further <u>infra</u>, the agreement pursuant to which Defendants claim the parties agreed to arbitration is the Customer Agreement for Defendant's cable-modem service. This is a transaction with an obvious effect on interstate commerce.

to arbitration on issues as to which an arbitration agreement has been signed." <u>Dean Witter Reynolds Inc. v. Byrd</u>, 470 U.S. 213, 218 (1985) (emphasis in original).

However, "arbitration is simply a matter of contract between the parties; it is a way to resolve those disputes – but only those disputes - that the parties have agreed to submit to arbitration." <u>First Options of Chicago, Inc. v. Kaplan</u>, 514 U.S. 938, 943 (1995).  Thus, before compelling arbitration on the merits of a dispute, questions regarding whether a dispute is arbitrable must be addressed.

> Problems of arbitrability usually arise in two contexts.  First, and most commonly, this question arises when the issue is whether an arbitration clause in an existing . . . agreement covers a particular dispute between the parties. . . . The second type of arbitrability question deals, not with the scope of the arbitration clause, but with whether there is even a valid agreement to arbitrate in effect at a particular time. This question usually arises in one of two factual scenarios: (1) whether the parties ever entered into an arbitration agreement at all, and (2) whether an arbitration agreement has expired or been terminated.

<u>Abram Landau Real Estate v. Bevona</u>, 123 F.3d 69, 72 (2d Cir. 1997) (citations omitted).  As to the question of whether the parties entered into an agreement to arbitrate, a party may challenge either the entire contract in which the arbitration provision is included, or the arbitration provision – or separate arbitration agreement – itself.  Moreover, as further discussed <u>infra</u>, in challenging a contract as a whole or the arbitration

8

provision specifically, a party may argue that the contract or provision does not exist, or is otherwise not valid. "[G]enerally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening § 2 [of the FAA]." Doctor's Assocs., Inc. v. Casarotto, 517 U.S. 681, 687 (1996). See also Cap Gemini Ernst & Young, U.S., L.L.C. v. Nackel, 346 F.3d 360, 365 (2d Cir. 2003) ("It is clear that questions of contractual validity relating to the unconscionability of the underlying arbitration agreement must be resolved first, as a matter of state law, before compelling arbitration pursuant to the FAA.").

### B. Parties' Claims as to Arbitrability

The parties primarily dispute two issues of arbitrability: 1) whether Plaintiff is bound by an arbitration provision included in a contract that Defendant claims Plaintiff accepted; and 2) whether, if Plaintiff is so bound, Plaintiff's claims in this action fall within the scope of that arbitration provision. In addition, Plaintiff alleges that, even if an agreement to arbitrate exists and it covers his claims in this action, the arbitration agreement should not be enforced because it is unconscionable.

### 1. Claims Regarding Whether Plaintiff is Bound by Arbitration Provision

As to the first issue, Defendant argues that Plaintiff

accepted and is bound by the arbitration provision of the
subscription agreement for Defendant's cable-modem service (in
effect in July 2001) (the "Customer Agreement"); the provision,
at Section 13 of the Customer Agreement, states that, with some
limited exceptions not relevant here,[5] "[a]ny controversy or
claim arising out of or related to this agreement . . . shall be
resolved by binding arbitration commenced with one year[.]"
Declaration of James An (in support of Defendant's Motion to
Compel Arbitration), Director of Business Operations, High Speed
Online Services, for Time Warner NY Cable Inc., dated March 23,
2004 ("First An Decl."), ¶ 10, and Exhibit 2 attached to First An
Decl.[6]  Defendant's argument that Plaintiff accepted and is bound
by the Customer Agreement, including its arbitration provision,
is based on the following claims: 1) Plaintiff installed
Defendant's "Road Runner" Internet access service using a self-
installation kit, which included a) a CD-ROM containing software
that could be installed only if the subscriber clicked a button
accepting the terms of the Customer Agreement (which was itself
provided, in an electronic version, in the CD-ROM), and b)
written materials including a "Getting Started Guide" with
installation instructions, and a "Road Runner User Guide," which

---

[5] See infra note 25.

[6] According to Defendant, the Customer Agreement in effect
as of November 2003 had a similar arbitration provision.  See
First An Decl. ¶ 9 & Exh. 6.

referred, respectively, to viewing, on screen, the "License Agreement" and "Software License Agreement" (which Defendant states are the same and included the Customer Agreement), Def. Mem. Compel 4, First An. Decl. ¶¶ 2-7; 2) Plaintiff affirmatively relied on the Customer Agreement in his original Complaint, by claiming a breach of contract, Def. Mem. Compel 4 (citing Compl. ¶¶ 1, 17); and 3) after Defendant's personnel made a service call at Plaintiff's home, Plaintiff signed a work order, dated November 12, 2003, which states, above the signature line, that the signature on the order indicates that the signatory has received and agreed to the terms of the Cable Modem Service Subscription Agreement, including Section 13 of the agreement providing for arbitration, Def. Mem. Compel 4, First An. Decl. ¶ 8.[7]

---

[7] The full text on the work order reads:

> MY SIGNATURE ON THIS ORDER INDICATES THAT I HAVE RECEIVED AND AGREED TO THE TERMS OF THE CABLE MODEM SERVICE SUBSCRIPTION AGREEMENT SEPARATELY PROVIDED TO ME BY TIME WARNER CABLE OF NEW YORK CITY, INCLUDING SECTION 13 OF THAT AGREEMENT, WHICH PROVIDES THAT THE PARTIES DESIRE TO RESOLVE DISPUTES RELATING TO THAT AGREEMENT THROUGH ARBITRATION. SUBSCRIBER ALSO ACKNOWLEDGES THAT BY AGREEING TO ARBITRATION, SUBSCRIBER IS GIVING UP VARIOUS RIGHTS, INCLUDING THE RIGHT TO A TRIAL BY JURY. THE TERMS OF THE CABLE MODEM SERVICE SUBSCRIPTION AGREEMENT, INCLUDING SECTION 13, ARE INCORPORATED INTO THIS WORK ORDER BY REFERENCE AS IF SET OUT IN FULL HEREIN.

First An. Decl. ¶ 8 and Ex. 5.

Plaintiff claims, however, that he (and other class members)
"did not knowingly assent to binding arbitration," Plaintiff's
Memorandum of Law in Opposition to Defendant's Motion to Compel
Arbitration ("Pl. Mem. Opp. Compel") 8.  He argues that he is not
bound by the arbitration agreement because he was not put on
"clear notice" of it.  Pl. Memo. Opp. To Motion to Compel 6.  In
particular, as to Defendant's argument regarding the loading of
the CD-ROM, Plaintiff recognizes that, in 2001, he initiated his
Road Runner Internet service by loading a "Road Runner High Speed
Internet software kit," but declares that: he has "no
recollection . . . of having seen, either in hard copy form or
electronically, any 'subscription' or 'customer' agreement of the
kind attached to [First An Decl. in Exhibits 2 and 6, discussed
above]"; he "do[es] not recall in [his] review of the Road Runner
guides that accompanied the kit any reference to a licensing
agreement, which [he] allegedly had to accept as a precondition
to executing the software"; and "had no idea that [his] rights
vis a vis Time Warner were to be governed by an arbitration
clause" and does "not recall ever having seen any notice advising
[him] that [he] was compelled to arbitrate."  Declaration of
Shlomo Bar-Ayal, dated April 21, 2004, in further support of his
opposition to Defendant's Motion to Compel Arbitration ("Pl.
Decl.") ¶¶ 2, 3, 4, 5.[8]

---

[8] As to Defendants' other arguments regarding whether
Plaintiff is bound by the arbitration provision, Plaintiff also

Defendant contends that Plaintiff's claim of not having seen any "subscription" or "customer" agreement when loading the Road Runner software is "not credible." Def. Reply Mem. To Compel 2. Defendant states that, when an individual installs the Road Runner software with the CD-ROM provided to new cable-modem-service subscribers in July 2001, the individual is clearly notified of certain agreements, including the Customer Agreement, is repeatedly asked to indicate whether he or she accepts them, and is told that he or she cannot install the software if he or she does not accept the agreements. Def. Reply Mem. To Compel 2-3; Second Declaration of James An (in support of Defendant's Motion to Compel Arbitration), Director of Business Operations, High Speed Online Services, for Time Warner NY Cable Inc., dated April 23, 2004 ("Second An Decl.").[9] The process as described by

_____

argues that: 1) the literature accompanying the CD-ROM included only "vague and ambiguous" references to the Customer Agreement, such that Plaintiff did not receive "adequate notice of the agreement in question," including its arbitration provision, Pl. Mem. Opp. Compel 3-4; 2) Plaintiff's claim for contract damages in his original Complaint does not constitute an admission that he accepted the Customer Agreement including its arbitration provision, id. at 4-5; and 3) the fact that Plaintiff signed the work order does not establish that he accepted the Customer Agreement and its arbitration provision because a "reasonable person" would not understand that he was so binding himself by signing such a work order, id. at 5 n.5.

   [9] The original CD-ROM used by Plaintiff to install the Road Runner software has, according to Plaintiff, not been located. Pl. Memo. Opp. To Motion to Compel 8 n.4. Defendant relies on "a CD-ROM identical to the ones that TWCNYC sent to new cable-modem-service subscribers in July 2001." Second An Decl. ¶ 5. In his Second Declaration, James An states what screens he saw when he installed the software contained on that CD-ROM on a computer;

Defendant will be further discussed _infra_.  Plaintiff's counsel
submitted, as a sur-reply in further opposition to Defendant's
Motion to Compel Arbitration, a Declaration by co-counsel Harley
J. Schnall, Esq., dated May 6, 2004 ("Schnall Decl.")[10],
reporting on co-counsel's own experience when loading a copy of
the Road Runner installation CD-ROM described in the Second An
Declaration.  The Schnall Declaration, which will be further
discussed _infra_, points to issues regarding whether or not it
would be clear to an individual loading the CD-ROM that he or she
was accepting certain agreements, including an arbitration
provision; ultimately, Plaintiff's counsel claims that, "[b]ased
on [counsel's] own experience in loading the software package,
assuming that it is the same package that the plaintiff allegedly

print-outs of the screens are attached to his Second Declaration.
The screen print-outs show only what an individual sees on first
looking at the screen; on many screens, however, an individual
must scroll down to see the entire content.
     In response to Plaintiff's counsel's letter dated April 28,
2004 (asking that "plaintiff's counsel be afforded an opportunity
to review the CD-ROM that was the subject of Mr. An[]'s analysis,
or an identical copy thereof, and full print-outs of not only the
screens allegedly notifying the user concerning the agreements at
issue, but also the full printouts of the agreements, themselves,
as they would have been presented electronically"), Defendant's
counsel provided what counsel stated to be a "true copy of the
CD-ROM described in the Second An Declaration," differing from
the original only in that the copy "does not bear the Road Runner
logo printed on the original."  Letter from Defendant to the
Court (Apr. 29, 2004) 1-2, Ex. A.  Defendant's counsel also
provided full copies of the agreements as they would appear
electronically when an individual scrolled down.  _Id._ Ex. C.

     [10] By memo-endorsed Order dated May 10, 2004, the Court
accepted Plaintiff's Sur-Reply, "giving it whatever weight it
deserves."

loaded in 2001, it is apparent that plaintiff and members of his class were not on fair notice of the existence of an arbitration clause."  Schnall Decl. ¶ 30.

Plaintiff's arguments as to whether he is bound by the arbitration provision in the Customer Agreement can be understood as a challenge either to the existence of the arbitration provision specifically, or to the existence of the overall Customer Agreement containing the arbitration provision at issue. Indeed, although Plaintiff's focus is on the arbitration provision, he also appears to be arguing, more generally, that he did not see, was not on clear notice of, and did not knowingly accept the Customer Agreement overall.

### 2. Scope of Arbitration Provision

Plaintiff claims that, even if the agreement to arbitrate exists, it does not cover this dispute, because the latter involves the imposition of franchise fees.

### 3. Unconscionability Claims

Plaintiff argues that, even if the arbitration provision at issue is binding on him (and other class members), it should not be enforced because it is unconscionable under New York state law.  Plaintiff claims both procedural and substantive unconscionability.  As to the procedural element, Plaintiff contends that he lacked meaningful choice in his ability to purchase both cable and Internet services, such that Defendant could "dictate contract terms," and that there was a "significant

disparity in bargaining power" between him and Defendant.[11]  Pl. Mem. Opp. Compel 12.  Plaintiff also contends that the arbitration provision is substantively unconscionable because: 1) it replaces the applicable statute of limitations, of three to six years, with a one-year limit for bringing claims; 2) it eliminates the right to a jury trial; 3) it eliminates pre-hearing discovery; 4) it eliminates the possibility of bringing class actions; and 5) it precludes actions in small-claims court, "mandating a costly arbitration process instead."  Pl. Mem. Opp. Compel 12.

### C. Who Should Decide Arbitrability Issues

The first question that must be addressed is who should decide arbitrability issues – this Court, or an arbitrator.[12]

---

[11] Plaintiff also claims, as part of his argument regarding unconscionability, that he was not put on notice of the Customer Agreement, including its arbitration provision.  This overlaps with his initial claim that no agreement to arbitrate exists because he was not on notice of the Customer Agreement generally, and of the Agreement's arbitration provision more specifically.

[12] The issue of who must decide issues of arbitrability has not been squarely addressed by the parties.  Defendant alternates in its position as to whether issues of arbitrability must be decided by the Court or the arbitrator, without extensively addressing the question.  See Def. Memo. To Compel 3 (stating that the Court must decide "whether the parties agreed to arbitrate" and "the scope of that agreement," citing Genesco, 815 F.2d at 844); Defendant's Reply Memorandum of Law in Support of Time Warner NY Cable's Motion to Stay Proceedings and Compel Arbitration ("Def. Reply Mem. To Compel") 1-2 (briefly stating that the Court need not address any questions of arbitrability because Plaintiff agreed to submit them to the arbitrator).  Plaintiff apparently assumes, also without discussion, that the

1. Relevant Law

"Under the FAA, as interpreted by the Supreme Court, the general presumption is that the issue of arbitrability should be resolved by the courts." Alliance Bernstein Inv. Research & Mgmt., 445 F.3d 121, 125 (citing First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944-45 (1995); AT&T Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 649 (1986)); accord Contec Corp. v. Remote Solution Co., Ltd., 398 F.3d 205, 208 (2d Cir. 2005). Therefore, "the issue of arbitrability may only be referred to the arbitrator if there is clear and unmistakable evidence from the arbitration agreement, as construed by the relevant state law, that the parties intended that the question of arbitrability shall be decided by the arbitrator." Contec, 398 F.3d at 208 (internal quotation marks and citation omitted; emphasis in original). Accord Alliance Bernstein Inv. Research & Mgmt., 445 F.3d at 125 ("[T]he issue of whether the parties agreed to arbitrate a matter is to be decided by the courts and not the arbitrators, 'unless the parties clearly and unmistakably provide otherwise.' AT&T Technologies, 475 U.S. at 649."); Abram Landau Real Estate, 123 F.3d at 72 ("When parties disagree about whether they ever entered into an arbitration agreement, a court decides that issue, absent a clear and unmistakable delegation of that authority to an arbitrator

_____

Court must decide issues of arbitrability.

[;] [u]nder these circumstances, any silence or ambiguity about whether such a question is arbitrable reverses the usual presumption that issues should be resolved in favor of arbitration.").

However, where a party challenges the <u>validity of a contract</u> (that includes an arbitration provision) <u>as a whole</u> – rather than the validity of the arbitrator provision itself, or a separate arbitration agreement - the arbitrator must decide that issue. <u>See</u> <u>Prima Paint Corp. v. Flood & Conklin Mfg. Co.</u>, 388 U.S. 395, 403-04 (1967) (regarding a claim of fraudulent inducement of the entire contract)[13]; <u>Buckeye Check Cashing, Inc. v. Cardegna</u>, 126 S. Ct. 1204, 1209 (2006) (noting that <u>Prima Paint</u> established that "unless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance").  Thus, when a party argues that the entire contract (containing an arbitration provision) is unconscionable, the arbitrator must decide that claim.  <u>See</u> <u>JLM Indust., Inc. v. Stolt-Nielsen SA</u>, 387 F.3d 163, 170 (2d Cir. 2004) ("Claims of unconscionability and adhesion contracts are similarly included within the <u>Prima Paint</u> rule.") (internal quotation marks and citation omitted).

---

[13] <u>Accord</u> <u>ACE Capital Re Overseas Ltd. v. Cent. United Life Ins. Co.</u>, 307 F.3d 24, 30 (2d Cir. 2002) ("It is well settled that a claim or defense of fraudulent inducement, when it challenges generally the enforceability of a contract containing an arbitration clause rather than specifically the arbitration clause itself, may be subject to arbitration.").

But "[t]he issue of the contract's validity is different
from the issue of whether any agreement between the [parties] was
ever concluded." Buckeye Check Cashing, Inc., 126 S. Ct. at 1208
n.1. The former question includes, for example, whether the
contract was fraudulently induced, or whether the contract was
rendered invalid by a usurious finance charge; the latter
includes questions as to whether a party actually signed the
contract, was authorized to sign it, or had the mental capacity
to consent to it. Id. Thus, as suggested by this distinction
made by the Buckeye Cashing Court, and as found by the Court of
Appeals for the Second Circuit[14], as well as judges in this

_____

[14] In Sphere Drake Ins. Ltd v. Clarendon Nat. Ins. Co., 263
F.3d 26 (2d Cir. 2001), the Court of Appeals, in harmonizing
Prima Paint with Interocean Shipping Co. v. Nat'l Shipping &
Trading Corp., 462 F.2d 673 (2d Cir. 1972), distinguished between
what it referred to as a "void" contract – i.e., a contract "that
produces no legal obligation" because it "does not come into
existence," for example because the parties have "fail[ed] to
agree to essential contract terms," id. at 31 – and a "voidable"
contract - i.e., "an agreement that 'unless rescinded . . .
imposes on the parties the same obligations as if it were not
voidable,'" id. (quoting Samuel Williston & Richard A. Lord, A
Treatise on the Law of Contracts § 1:20, at 50 (4th ed. 1990)),
such as the one involved in Prima Paint, where the parties
alleged fraud in the inducement as to the entire contract, id.
The Sphere Drake Court found that a party is entitled to a trial
before the court on the arbitrability issue only if the party
alleges (with some supporting evidence) that the contract
containing the arbitration clause is void as a whole, or that the
arbitration clause itself is voidable. Id. at 31-32. See also
Denney v. BDO Seidman LLP, 412 F.3d 58, 68 (2d Cir. 2005)
(referring to "the reasoning underlying [the Court of Appeals']
ruling in Sphere Drake, which seeks to protect parties from
arbitration only in those narrowly-limited circumstances where
the very existence of a contract is in doubt"). These cases
appear to use a different definition of "void" than the Buckeye
Check Cashing Court, which found that the claim that a contract

district,[15] the <u>Prima Paint</u> rule does not apply to claims that a contract that includes an arbitration agreement does not, as a whole, exist.

---

containing an arbitration is "void for illegality" (because it violated state laws) must be resolved by an arbitrator, not a court; because <u>Sphere Drake</u> and its progeny actually use "void" in the sense of "non-existent," those cases appear to be consistent with <u>Buckeye Check Cashing</u>, despite the potential confusion caused by the differing use of the same terms.

[15] For example, in <u>In re Nuclear Electric Ins. Ltd. (Central Power and Light Co.)</u>, No. 96 Civ. 2661, 926 F. Supp. 428, 433-35 (May 24, 1996), Judge Stein, in a thorough discussion of <u>Prima Paint</u> and its progeny, concluded that challenges to the existence of a contract (where "a party claims that it never actually manifested assent to the contract containing an agreement to arbitrate") must be decided by the court, but challenges seeking to avoid a contract (containing an arbitration provision) that the party "concedes that it willingly manifested assent to" must be decided by the arbitrator, <u>id.</u> at 434; as Judge Stein explains, in the former case, "that party cannot be forced to arbitrate until it is first established by a court that the party willingly manifested assent to the underlying contract," whereas in the latter case, "that party's claim is simply a defense to arbitrability that is itself arbitrable," <u>id.</u>  <u>See also</u> <u>In re Azores Int'l Shipping, Inc. (Panamanian Carriers Corp.)</u>, No. 99 Civ. 850, 1999 WL 493380, at *2, 1999 U.S. Dist. LEXIS 10398, at *4 (S.D.N.Y. July 9, 1999) (finding that the action – in which respondent claimed that it could not be compelled to arbitrate because the party that signed the contract containing the arbitration clause at issue was not authorized to enter into agreements on respondent's behalf - was not controlled by <u>Prima Paint</u> because "<u>Prima Paint</u> and its progeny addressed existing contracts that parties sought to escape[;] [n]either the parties in <u>Prima Paint</u> nor in the other cases cited by defendant denied the very existence of the contract to be arbitrated"); <u>PMC, Inc. v. Atomergic Chemetals Corp.</u>, 844 F. Supp. 177, 181 (S.D.N.Y. 1994) (reading <u>Prima Paint</u> as "'limited to challenges seeking to <u>avoid</u> or <u>rescind</u> a contract - not to challenges going to the very existence of a contract that a party claims never to have agreed to'") (quoting <u>Three Valleys Municipal Water Dist. v. E.F. Hutton & Co.</u>, 925 F.3d 1136, 1140 (9th Cir. 1991); emphasis in original)).

Thus, absent clear and unmistakable evidence that the parties intended that questions of arbitrability be resolved by arbitration, the court has two initial tasks when it is asked to compel arbitration and stay judicial proceedings pending the arbitration: "first, it must determine whether the parties agreed to arbitrate[16]; second, it must determine the scope of that agreement." Genesco, 815 F.2d at 844 (citations omitted); accord Mehler v. Terminix Int'l Co. L.P., 205 F.3d 44, 47 (2d Cir. 2000).[17]

"When contract formation is at issue in an FAA case, we generally apply state-law principles." Adams v. Suozzi, 433 F.3d 220, 227 (2d Cir. 2005). See also Alliance Bernstein Inv. Research & Mgmt., 445 F.3d at 125 (stating that, where an arbitration agreement is at issue, "courts generally look to state law for guidance as they seek to ascertain the parties'

---

[16] As to this question, as discussed supra, the Court must address any claims by the non-moving party (seeking to avoid arbitration) regarding the existence of the underlying contract as a whole, or the existence or validity of the arbitration provision (or a separate arbitration agreement) itself, but the Court cannot address any challenge to the validity of the contract as a whole.

[17] The court then has two additional tasks: "third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then determine whether to stay the balance of the proceedings pending arbitration." Genesco, 815 F.2d at 844 (citations omitted). But only the first two inquiries are at issue here. See Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Compel Arbitration 6.

intent"); <u>Mehler v. Terminix Int'l Co. L.P.</u>, 205 F.3d 44, 48 (2d Cir. 2000) ("in deciding whether the parties agreed to arbitrate a certain matter, courts should generally apply state-law principles that govern the formation of contracts").

    2. Analysis

        <u>a.  Whether There is "Clear and Unmistakable Evidence" that Arbitrability Issues Should be Decided by Arbitrator</u>

As noted above, this Court should decide any claims challenging the existence (but not the "validity") of the contract containing the arbitration provision at issue, and any issues concerning the existence or validity of the arbitration clause specifically, as well as other issues concerning arbitrability, unless the Court finds that "there is <u>clear and unmistakable evidence</u> from the arbitration agreement, as construed by the relevant state law, that the parties intended that the question of arbitrability shall be decided by the arbitrator," <u>Contec</u>, 398 F.3d at 208 (internal quotation marks and citation omitted).[18]

--------

[18] The relevant state law in <u>Contec</u> was "New York law, which follows the same standard as federal law with respect to who determines arbitrability: generally, it is a question for the court unless there is 'a 'clear and unmistakable' agreement to arbitrate arbitrability.'"  <u>Contec</u>, 398 F.3d at 208 n.1 (quoting <u>Shaw Group Inc. v. Triplefine Int'l Corp.</u>, 322 F.3d 115, 121 (2d Cir. 2003) (quoting <u>Smith Barney Shearson Inc. v. Sacharow</u>, 91 N.Y.2d 39, 45-46, 666 N.Y.S.2d 990, 993, 689 N.E.2d 884 (1997))).

In this case, the arbitration clause by which Defendant claims Plaintiff is bound states, in relevant part:

> ANY CONTROVERSY OR CLAIM ARISING OUT OF OR RELATED TO THIS AGREEMENT (BUT NOT ANY CLAIMS ARISING OUT OF COMMERCIAL ACTIVITIES OR THE THEFT OR OTHER UNAUTHORIZED RECEIPT OF ANY TIME WARNER CABLE SERVICE ON THE PART OF CUSTOMER) SHALL BE RESOLVED BY BINDING ARBITRATION COMMENCED WITHIN ONE YEAR UNDER THE THEN-CURRENT COMMERCIAL ARBITRATION RULES OF THE AMERICAN ARBITRATION ASSOCIATION (OR ANY CONSUMER RULES ADOPTED BY THE AMERICAN ARBITRATION ASSOCIATION TO WHICH BOTH PARTIES AGREE), EXCEPT THAT EITHER PARTY MAY SEEK EQUITABLE OR INJUNCTIVE RELIEF ONLY IN AN APPROPRIATE COURT OF LAW OR EQUITY. . . . THE ARBITRABILITY OF DISPUTES SHALL BE DETERMINED BY THE ARBITRATOR.

Section 13 of Customer Agreement, First An. Decl. Exh. 2.

The arbitration provision specifically refers the question of the "arbitrability of disputes" to the arbitrator. The "arbitrability of disputes" includes both questions as to the existence and validity of the arbitration agreement, and questions as to the scope of the arbitration provision and whether particular issues are covered by it. Moreover, the phrase encompasses questions as to the existence of the underlying contract as a whole, if such questions are raised in connection with the issue of arbitrability – e.g., by a party claiming that he or she cannot be compelled to arbitrate because he or she did not enter into the Customer Agreement and therefore cannot be bound by its arbitration provision.

Furthermore, the arbitration provision incorporates, by

reference, the Commercial Arbitration Rules of the American
Arbitration Association (AAA), which in relevant part provide
that "[t]he arbitrator shall have the power to rule on his or her
own jurisdiction, including any objections with respect to the
existence, scope or validity of the arbitration agreement," AAA
Rule R-7(a).[19]  American Arbitration Association, Commercial
Arbitration Rules and Mediation Procedures (amended and effective
September 15, 2005), http://www.adr.org/sp.asp?id=22440#R7.[20]  In
Contec, the Court of Appeals found "clear and unmistakable
evidence" that the parties intended that the question of
arbitrability shall be decided by the arbitrator where the
arbitration provision at issue stated that any controversy would
be resolved by arbitration "in accordance with the Commercial
Arbitration Rules of the American Arbitration Association," 398
F.3d at 208; the Contec Court specifically referred to AAA Rule
R-7(a).  The Court held that when "parties explicitly incorporate
rules that empower an arbitrator to decide issues of

---

[19] Section 13 of the Customer Agreement also incorporates,
alternatively, "any consumer rules adopted by the American
Arbitration Association to which both parties agree."  The AAA's
"Supplementary Procedures for Consumer-Related Disputes,"
effective September 15, 2005, supplement the AAA's commercial
dispute resolution procedures.  American Arbitration Association,
Supplementary Procedures for Consumer-Related Disputes,
http://www.adr.org/sp.asp?id=22014.

[20] This provision concerning the arbitrator's power to rule
on his or her own jurisdiction appears in all previous versions
of the AAA's commercial arbitration rules since 2000.  The
archived rules are available at http://www.adr.org/RulesArchives.

arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator." Id. Accord Alliance Bernstein Inv. Research & Mgmt., 445 F.3d at 126 (quoting Contec). Specifically, the Contec Court found that the incorporation of AAA Rule R-7a evidences an intent for the arbitrator to decide issues as to the existence of the contract (that includes the arbitration provision) as a whole; the issue in that case was whether the party seeking to compel arbitration had any rights under an agreement, signed by the other party, that included an arbitration provision, and the Court concluded that this issue must be decided by an arbitrator. See Contec, 398 F.3d at 211.

The Court concludes that the arbitration provision at issue here, both in its explicit language and its incorporation of the AAA's Commercial Arbitration Rules, constitutes sufficiently clear and unmistakable evidence that the parties intended to have issues of arbitrability decided by the arbitrator.

b. Whether Plaintiff Is Bound by Arbitration Provision of Customer Agreement

Plaintiff, however, contends that he (and other class members) "did not knowingly assent to binding arbitration" as set forth in the Customer Agreement. Pl. Mem. Opp. Compel 8. Plaintiff's argument implies, more specifically, that Plaintiff and other class members did not intend to agree to have the issue

25

of arbitrability itself decided by an arbitrator.  Thus, this
Court must engage in a further inquiry,[21] guided by principles of
state contracts law.  Cf. Contec, 398 F.3d at 209 (stating, as to
the further question of whether a non-signatory to the agreement
that included the arbitration clause could compel a signatory to
arbitrate a dispute, that, "[i]n order to decide whether
arbitration of arbitrability is appropriate, a court must first
determine whether the parties have a sufficient relationship to
each other and to the rights created under the agreement" – and
finding, in the circumstances of that case – including the fact
that the party seeking to avoid arbitration had signed the
agreement that included the arbitration provision - that it was
appropriate to refer the question of arbitrability to
arbitration); First Options of Chicago, Inc. v. Kaplan, 514 U.S.
938, 946 (1995) (finding, as to the question of whether a
signatory to an agreement that included an arbitration provision
could compel non-signatories to arbitrate a dispute, that, "[o]n
the record before [the Court], [the signatory] cannot show that
the [non-signatories] clearly agreed to have the arbitrators
decide (i.e., to arbitrate) the question of arbitrability,"

_____

[21] This inquiry, in the particular circumstances of this
case, is in effect similar to the inquiry that the Court would
conduct if it were itself deciding the existence of the Customer
Agreement as a whole, and the existence and validity of the
agreement to arbitrate more specifically.  But the purpose of the
Court's inquiry is to determine whether Plaintiff consented to
the referral of arbitrability issues to the arbitrator, which is
included in the arbitration provision of the Customer Agreement.

because the fact that the non-signatories had filed, with the
arbitrators, a written memorandum arguing that the arbitrators
did not have jurisdiction over the dispute, did not evidence an
intent for issues of arbitrability to be resolved by
arbitration).

<u>i.  Relevant New York law</u>[22]

"'In determining whether a party entered into a binding
contract, courts eschew the subjective and look to objective
manifestations of intent as established by words and deeds.'"  <u>In
re Rose BB</u>, 752 N.Y.S.2d 142, 144, 300 A.D.2d 868, 869-870 (3d
Dep't 2002) (quoting <u>Ahlstrom Mach. v. Associated Airfreight</u>, 708
N.Y.S.2d 497, 272 A.D.2d 739, 741 (3d Dep't 2000); further
internal quotation marks, citation, and added emphasis omitted).
<u>See also</u> <u>Genesco</u>, 815 F.2d at 845, 846 ("Under general contract
principles a party is bound by the provisions of a contract that
he signs, unless he can show special circumstances that would
relieve him of such an obligation" and a court must "focus not on

_____

[22] The parties do not explicitly address to which state law
the Court should look in this case; but the only state law
citations in parties' submissions (in Defendant's Reply) are to
New York cases.  The arbitration provision of the Customer
Agreement does not refer to state law, stating instead that "the
Federal Arbitration Act, 9 U.S.C. Section 1 to 16, shall govern
the interpretation and enforcement of this paragraph," First An
Decl. Exh. 2 ¶ 13 (font altered); furthermore, the Agreement as a
whole does not specify a choice of law.  The circumstances of
this case - including that Plaintiff is a resident of the State
of New York and the County of New York, and defendant Time Warner
Cable allegedly has its principal place of business in New York,
<u>see</u> Am. Compl. ¶¶ 5,6 - indicate that it is appropriate for this
Court to be guided by New York law.

whether there was subjective agreement as to each clause in the contract, but on whether there was an objective agreement with respect to the entire contract"). "Consent to arbitrate cannot be given by inadvertence." Marek v. Alexander Laufer and Son, Inc., 257 A.D.2d 363, 364, 683 N.Y.S.2d 50, 51 (1st Dep't 1999). An arbitration agreement "must be clear, explicit and unequivocal and must not depend upon implication or subtlety." Waldron v. Goddess, 61 N.Y.2d 181, 183-84, 461 N.E.2d 273, 274, 473 N.Y.S.2d 136, 137 (1984) (internal quotation marks and citations omitted). See also Miner v. Walden, 101 Misc.2d 814, 819, 422 N.Y.S.2d 335, 339 (N.Y. Sup. Ct. 1979) (noting that "[a]n agreement to arbitrate has been held to be enforceable if it had been openly and fairly entered into" and "[t]he language whereby a party agrees to or is under a duty to arbitrate should be clear and unequivocal and the burden lies on the party seeking arbitration" (internal quotation marks and citations omitted)).  However, an individual who signs or otherwise assents to a contract without reading it (despite having an opportunity to do so) is bound by that contract, including its arbitration provision.  See Tsadilas v. Providian Nat. Bank, 786 N.Y.S.2d 478, 480, 13 A.D.3d 190, 190 (1st Dep't 2004) (finding that "[p]laintiff is bound by the arbitration provision even if she did not read it"); for contracts more broadly, see Peabody v. Northgate Ford, Inc., 794 N.Y.S.2d 452, 454, 16 A.D.3d 879, 880 (3d Dep't 2005); Waters v. New York Property Ins. Underwriting Ass'n, No. 117342/03, 9

28

Misc.3d 1126(A), 1126(A), 2005 N.Y. Slip Op. 51795(U), 2, 2005 WL
2934822, at *2, 2005 N.Y. Misc. LEXIS 2459, at *5 (N.Y. Sup. Ct.
Sept. 29, 2005).

> ii.  Whether Plaintiff Accepted the Customer
> Agreement, Including its Arbitration
> Provision, In Loading the CD-ROM

As noted earlier, Defendant contends that Plaintiff's claim
of not having seen the Customer Agreement when loading the Road
Runner software is "not credible."  Def. Reply Mem. To Compel 2.
Defendant describes the loading process, and the information
shown to the user as he or she loads the CD-ROM, as follows.  The
screen immediately following the "welcome" screen notifies the
person installing the software that he or she will see two
agreements on the screen – the Broad Jump Software License
Agreement and the Road Runner Agreement - and further states:

> At the end of each agreement, please click on
> the Accept button if you agree to be bound by
> all of its terms, and if you over the age of
> eighteen.  You may thereafter install and
> complete the Road Runner Self Installation
> according to those terms.  If you do not
> agree to all of the terms of each agreement,
> click on the Decline button and do not
> install or use this CD-Rom.  Please
> understand that if you do not click Accept on
> both the Broad Jump Software License
> Agreement and the Road Runner Agreement, you
> will not be able to install the software and
> complete the Road Runner Self-Installation.

Second An Decl. ¶ 6 & Exh. 2.  If the individual clicks the
"Accept" button on this screen, the following two screens

provide, respectively, the "Software License Agreement" and the
"Road Runner Agreement," which includes a reference to the
"Customer Agreement" and other agreements that are part of the
Road Runner Agreement; the installing individual is required to
click "Accept" on each screen in order to continue.  Second An
Decl. ¶¶ 7,8 & Exhs. 3, 4; Exhibit C attached to Defendant's
Letter Dated April 29, 2004 (showing full screen shots of
agreement, as would appear to an individual if he or she fully
scrolls down) ("April 29, 2004, Exh. C") (Screens 3 & 4).  The
following screen shows the "Customer Agreement," which includes
Section 13 concerning arbitration.  Second An Decl. ¶ 9 & Exh. 5;
April 29, 2004, Exh. C (Screen 5).  The following screens show
the other parts of the Road Runner Agreement, including the
"Acceptable Use Policy," the "Customer Privacy Notice," and the
"Note About Multiple Connections"; again, the "Accept" button
must be clicked on each screen to continue.  Second An Decl. ¶ 10
& Exh. 6; April 29, 2004, Exh. C (Screens 6-8).  The screen that
then appears states:

> I have had the opportunity to read and
> understand each any every term set forth in
> the Road Runner Agreement, including the
> terms of the Customer Agreement . . . .  I
> understand that by clicking the Accept button
> below, I am agreeing to be bound by all of
> the terms and conditions detailed therein, as
> if I had written my signature to each of the
> agreements, including Section 13 of the
> Customer Agreement, which provides that the
> parties desire to resolve disputes relating
> to the Customer Agreement through
> arbitration, and that by agreeing to

> arbitration, I am giving up various rights,
> including the right to a jury trial.
> If you agree, click on the Accept button and
> continue with the Road Runner Self
> Installation.  If you do not accept these
> conditions, click on the Decline button.
> Thereafter, do not install or otherwise
> manipulate the software.

Second An Decl. ¶ 11 & Exh. 7.  If an individual clicks "Accept,"
the software installation steps begin.  Second An Decl. ¶¶ 11, 13
& Exh. 9.

Plaintiff's Sur-Reply, i.e., the Schnall Declaration, does
not dispute the description of the screens noted above, nor that
an individual installing the CD-ROM is required to click "Accept"
in order to continue from one screen to the next.  But the Sur-
Reply points to a few specific issues.  First, Plaintiff states
that the navigation bar that appears at the bottom of each screen
after the welcome screen provides operative buttons only for
"Help," "Print," "Accept," and "Decline,"; the "Back" button is
inoperative, Schnall Decl. ¶ 10; furthermore, the navigation bar
is "static, such that one could inadvertently click 'Accept'
before scrolling down to read the entire text or inadvertently
click 'Accept' multiple times at once and miss a screen of text
entirely," id. ¶ 13.  Furthermore, in order to view the full text
of the Customer Agreement, an individual must scroll through
about 700 lines, Schnall Decl. ¶ 19; indeed, the full print-outs
provided by Defendant for the Customer Agreement amount to 38
screens, April 29, 2004, Exh. C.  To reach the arbitration

provision at Section 13 of the Customer Agreement, an individual
must scroll through about 30 screens (600 lines); the text of the
arbitration provision is completely capitalized, but it is not
"highlighted or set-off in another color or font."  Schnall Decl.
¶¶ 19, 20.  Moreover, the "Help" button is not always clear or,
it seems, accurate: specifically, when "help" is clicked on the
screen showing the Customer Agreement (Screen 5) and on the
screen that asks for a final acceptance of the Road Runner
Agreement (Screen 9), the message that pops up is entitled
"Software license agreement" and states that "you must choose
whether you do or do not accept the license agreement before you
can proceed").  Schnall Decl. ¶¶ 8, 18, 29.  Finally, Mr. Schnall
argues that in certain instances the screens state policies or
information that do not require acceptance, per se, yet an
individual must click "Accept" to proceed, id. ¶ 22, 24, 26
(referring to the screens showing the Road Runner Acceptable Use
Policy, the Customer Privacy Notice, and the Note About Multiple
Connections); Mr. Schnall appears to claim, therefore, that this
constituted another "ambiguit[y]" that "compounded the notice
problem," id. ¶ 30.

    Based on the above, and guided by New York state law, the
Court concludes that Plaintiff, in installing the Road Runner
software through a similar CD-ROM, accepted the terms of the
Customer Agreement, including its arbitration provision (and
including the latter's referral of arbitrability issues to the

arbitrator).  First, an individual who, like Plaintiff, used a
Road Runner self-installation CD-ROM as described above would
have been initially informed that, on the following screens, he
or she would see certain agreements and that, "at the end of each
agreement," he or she should click "accept" if he or she agreed
to be bound by all of the terms of the agreements (and should
click "decline," if not, in which case the individual would not
be able to download the software), Second An Decl. Exh. 2; April
28, 2004, Exh. C (Screen 2 - no need to scroll down to see full
text).  The individual would then have been required to click
"accept" eight times in order to install the software, including
a final "accept" indicating that the individual "had the
opportunity to read and understand each any every term set forth
in the Road Runner Agreement, including the terms of the Customer
Agreement" and "underst[oo]d that by clicking the Accept button
below, [he or she was] agreeing to be bound by all of the terms
and conditions detailed therein . . . including Section 13 of the
Customer Agreement, which provides that the parties desire to
resolve disputes relating to the Customer Agreement through
arbitration," Second An Decl. Exh. 7; April 28, 2004, Exh. C
(Screen 9 - no need to scroll down to see full text).

Furthermore, the Customer Agreement, including the
arbitration provision - which was written in clear and
unequivocal language - was available in full to the individual.
It was not hidden or hard to find, but rather presented on the

computer screen.[23]  Although it is true that the individual would
have had to scroll down through about 38 screens to read the
Customer Agreement in its entirety (including 30 screens before
reaching the arbitration provision), it is not significantly more
arduous to scroll down to read an agreement on a computer screen
than to turn the pages of a printed agreement; that an individual
must go through multiple computer screens to read an agreement
does not in and of itself mean that he should not be bound by his
consent to the agreement as manifested by his clicking of the
"accept" button.  Furthermore, the agreement could be printed out
if an individual found it necessary or helpful to do so; printed
out, the agreement is about nine pages - not an extraordinary
length.  And the fact that an individual could click the "Accept"
button without having to scroll down to the end of the agreement
does not mean that an individual's clicking of the "accept"
button is therefore inherently meaningless; indeed, an individual
who signs or otherwise assents to a contract without reading it
is bound by that contract, including its arbitration provision.
See Tsadilas v. Providian Nat. Bank, 786 N.Y.S.2d 478, 480, 13
A.D.3d 190, 190 (1st Dep't 2004); Peabody v. Northgate Ford,
Inc., 794 N.Y.S.2d 452, 454, 16 A.D.3d 879, 880 (3d Dep't 2005).

     Moreover, the arbitration provision itself (including its

---

     [23] It was clear from the initial "Customer Agreement" screen
that appeared that an individual would need to scroll down to see
the agreement in its entirety, and the scroll bar would indicate
when the end was reached.

statement concerning the resolution of arbitrability issues by
the arbitrator) was not obscured but rather was the same size
print as the rest of the agreement and written in all capitalized
letters, thus standing out from the rest; Plaintiff's claim that
the provision was not sufficiently visible is therefore
unpersuasive.  See Kimi Jewelers, Inc. v. Advance Burglar Alarm
Systems, Inc., 555 N.Y.S.2d 51, 52 (1st Dep't 1990) ("We reject
plaintiff's claim that the waiver provision was deeply and
inconspicuously hidden in the agreement. It was set forth in the
rather short agreement in the same size print as every other
provision of the document and under the heading "LEGAL ACTION",
so as to draw one's attention to it."); Edwards v. North American
Van Lines, 513 N.Y.S.2d 895, 897, 129 A.D.2d 869, 870, (3d Dep't
1987) (finding it "evident that the arbitration clause was not
hidden in the fine print of the contract" where "the front of the
contract provides in bold print and larger type that the contract
'INCLUDES THE CONDITIONS PRINTED ON THE BACK HEREOF'" and the
arbitration provision appears on the back of the contract, under
the heading "in bold print and larger type . . . 'TIME OF FILING
CLAIM FOR DAMAGES-ARBITRATION'").  And the question of whether
the "help" feature was sufficiently informative - on which
Plaintiff focuses - is not decisive, because the text in the main
screens was sufficiently clear for an individual to understand
that he or she was being asked if he or she accepted certain

35

agreements provided in those main screens.[24]

Specht v. Netscape Communications Corp., 306 F.3d 17 (2d Cir. 2002), on which Plaintiff primarily relies, is not to the contrary.  In Specht, the plaintiffs downloaded a browser program called Netscape Communicator, as well as a "plug-in" program called SmartDownload; they brought claims against the defendants related to these programs, and defendants sought to compel arbitration and stay court proceedings.  Id. at 21-23.  All of the plaintiffs except for one downloaded and installed Communicator in connection with downloading SmartDownload.  Id. at 22.  These plaintiffs allegedly came upon a Netscape webpage with the caption "SmartDownload Communicator"; the page stated "Download With Confidence Using SmartDownload!," and featured, near the bottom of the screen, a "Start Download" prompt with a "tinted button labeled 'Download.'"  Id. at 22.  The plaintiffs clicked on the button and downloaded and installed SmartDownload,

_____

[24] The Court also finds unpersuasive the claim that, in some instances, an individual should not have been required to click "accept" insofar as he or she was being informed of a policy or given additional information, and that this helped to confuse the issue of what an individual would be accepting.  It does not seem inappropriate to require an individual to "accept" the Road Runner Acceptable Use Policy (which states that subscribers accept certain restrictions and agree not to use the service for certain purposes), the Customer Privacy Notice, and the Note About Multiple Connections (which specifies certain requirements and costs involved in having multiple connections).  Second An Decl. ¶ 10 & Exh. 6; April 29, 2004, Exh. C (Screens 6-8).  In any event, it would be clear to a reasonable would-be subscriber that clicking the "accept" button for the "Customer Agreement" would mean that the individual was accepting the terms of the agreement.

which then permitted them to download and install Communicator.

When they downloaded Communicator from the Netscape website, the

plaintiffs, upon initiating the installation of Communicator,

"were automatically shown a scrollable text of that program's

license agreement and were not permitted to complete the

installation until they had clicked on a 'Yes' button to indicate

that they accepted all the license terms."  Id. at 21-22.  The

Court of Appeals noted:

> This kind of online software license
> agreement has come to be known as "clickwrap"
> (by analogy to "shrinkwrap," used in the
> licensing of tangible forms of software sold
> in packages) because it "presents the user
> with a message on his or her computer screen,
> requiring that the user manifest his or her
> assent to the terms of the license agreement
> by clicking on an icon.  The product cannot
> be obtained or used unless and until the icon
> is clicked."

Id. at 22 n.4 (quoting Specht v. Netscape Communications Corp.,

150 F. Supp. 2d 585, 593-94 (S.D.N.Y. 2001)).  The Court stated

that the plaintiffs "expressly agreed to Communicator's license

terms by clicking 'Yes.'"  Id. at 22.  The Communicator license

agreement contained an arbitration provision.  Id.

The Court emphasized that "[t]he signal difference between

downloading Communicator and downloading SmartDownload was that

no clickwrap presentation accompanied the latter operation."  Id.

at 23.  "The sole reference to SmartDownload's license terms on

the 'SmartDownload Communicator' webpage was located in text that

would have become visible to plaintiffs only if they had scrolled

37

down to the next screen": if, rather than simply clicking on the "Download" button to obtain SmartDownload, the plaintiffs had scrolled down, they would have seen text asking them to "review and agree to the terms of the *Netscape SmartDownload software license agreement* before downloading and using the software." Id. Plaintiffs averred, however, that they had not seen this. Id. After clicking on the "Download" button, moreover, "plaintiffs encountered no further information about the plug-in program or the existence of license terms governing its use." Id. Furthermore, even if plaintiffs had scrolled down and seen the text noted above before downloading SmartDownload, "SmartDownload's license terms would not have been immediately displayed in the manner of Communicator's clickwrapped terms"; rather, a user would have had to click on the underlined text to be taken by hyperlink to a separate webpage, with yet another set of links, one of which would have taken the user to another webpage that contained the full text of a license agreement, which included an arbitration provision. Id. at 23-24.

Guided in part by relevant state law (in that case, California law), the Court of Appeals "h[e]ld that a reasonably prudent offeree in plaintiffs' position would not have known or learned, prior to acting on the invitation to download, of the reference to SmartDownload's license terms hidden below the 'Download' button on the next screen"; therefore, the Court "conclude[d] that under the circumstances here, plaintiff's

downloading of SmartDownload did not constitute acceptance of defendants' license terms," including its arbitration provision. Id. at 35.  See also id. at 32 (concluding that "in circumstances such as these, where consumers are urged to download free software at the immediate click of a button, a reference to the existence of license terms on a submerged screen is not sufficient to place consumers on inquiry or constructive notice of those terms" and finding therefore that "plaintiffs did not manifest assent to SmartDownload's license terms").  There are, however, no dispute between the parties that plaintiffs had accepted the Communicator licensing agreement (including its arbitration provision).  Id. at 35.

In this case, the circumstances are more akin to those in Specht surrounding the Communicator license agreement than the SmartDownload agreement: individuals seeking to install the Road Runner Internet access service with a self-installation CD-ROM were "automatically shown a scrollable text of that program's . . . agreement[s] and were not permitted to complete the installation until they had clicked on a 'Yes' button to indicate that they accepted all the . . . terms."  Id. at 21-22. Plaintiff did not simply happen upon a free download which made no easily visible reference to a binding agreement.  Thus, Specht (even assuming it would apply here although it is based largely on California state law) does not suggest that Plaintiff failed to manifest his or her assent to the terms of the Customer

39

Agreement; on the contrary, the analogies and rationale to be
drawn from <u>Specht</u> indicate that Plaintiff, by installing the Road
Runner software after presumably clicking "Accept" eight times
(as he must have in order for the installation to proceed),
agreed to the Customer Agreement, including its arbitration
provision (and that provision's indication that arbitrability
questions should be decided by the arbitrator).  <u>See also</u> <u>Moore</u>
<u>v. Microsoft Corp.</u>, 741 N.Y.S.2d 91, 92, 293 A.D.2d 587, 587 (2d
Dep't 2002) (finding that, where terms of agreement contained in
defendant's software program were "prominently displayed on the
program user's computer screen before the software could be
installed" and "the program's user was required to indicate
assent to the [agreement] by clicking on the "'I agree' icon
before proceeding with the download of the software," "the
defendant offered a contract that the plaintiff accepted by using
the software after having an opportunity to read the license at
leisure").

<u>c. Scope of Arbitration Provision</u>

        For the reasons discussed above, the question of
whether this action falls within the scope of the arbitration
provision is also an issue for the arbitrator to decide.[25]

---

        [25] The Court notes that, by letter dated March 14, 2005,
Plaintiff refers to <u>Sevier v. Time Warner Cable, Inc.</u>, No. 03
Civ. 7747 (S.D.N.Y.), Transcript of April 19, 2004, Hearing
(<u>Sevier</u> Tr.) (attached as Exhibit 1 to Declaration of Andrew S.
Weinstein in support of Defendant's Motion to Compel
Arbitration), in which Judge Sprizzo denied defendant's motion to

        d. Unconscionability

        Plaintiff argues that, even if the arbitration

_____

compel arbitration in a case involving the same arbitration
clause as the one at issue here.  Judge Sprizzo suggested that
the arbitration clause (including its provision that matters of
arbitrability are to be decided by the arbitrator) did not apply
in that case because of the "commercial activities" exception.
Sevier Tr. 6-9.  But, ultimately, Judge Sprizzo did not clearly
hold this, see Sevier Tr. 11 ("I would have to determine what
commercial activity meant . . . but then I don't know where that
would shake out . . . ."); rather, his decision seems to rest
primarily on his holding that the arbitration clause "raises
substantial policy considerations" because it "has the effect of
nullifying statutory remedies" for antitrust violations, Sevier
Tr. 22; see also id. at 13-22 (focusing on this issue).  Sevier
was first mentioned in Defendant's Reply Brief at 1 n.1.
Plaintiff, in discussing Sevier, is responding to an update
provided by Defendant regarding the case (by letter dated March
10, 2005, informing the Court that the case was remanded to the
district court by the Court of Appeals in light of a tentative
settlement between the parties).  But in doing so, Plaintiff
purports to present new arguments that were not raised in his
briefs (either his opposition brief or "sur-reply"): namely, 1)
that the "commercial activities" exception provides another
reason why Plaintiff is not bound by the arbitration agreement,
and 2) that, because the arbitration agreement limits recoverable
damages, he should not be compelled to arbitrate, insofar as he
seeks statutory damages and refunds not related to service
interruptions.  Letter from Plaintiff to Court 1-2 (Mar. 14,
2005).  Responding to Defendant's update as to the procedural
history of Sevier is not an opportunity to raise entirely new
arguments; thus the Court need not consider these arguments.  In
any event, Plaintiff's argument concerning the "commercial
activities" exception appears to lack merit.  Reading that phrase
to include, as Plaintiff implies, the activity of using and
paying for services provided by Time Warner Cable would result in
the exception effectively subsuming the entire arbitration
provision and rendering it meaningless; under New York law, a
court, although "not free to alter the plain terms of an
agreement or to strain language beyond its reasonable and
ordinary meaning," must interpret a contract to give all of its
provisions "full meaning and effect," Shaw Group Inc. v.
Triplefine Intern. Corp., 322 F.3d 115, 124 (2d Cir. 2003)
(internal quotation marks omitted).

provision at issue is binding on him (and other class members),
it should not be enforced because it is unconscionable under New
York state law.  This argument pertains to the validity of the
arbitration provision (rather than to its existence, which has
been discussed above).  As noted at the outset, Plaintiff makes
claims of both procedural and substantive unconscionability.  As
to the procedural element, Plaintiff contends that: Defendant was
able to "dictate contract terms" because "upon information and
belief, Time Warner has been able to function as a monopoly in
the area of cable modem services"; Plaintiff lacked meaningful
choice in his ability to purchase both cable and Internet
services; there was a "significant disparity in bargaining power"
between Plaintiff and Defendant; and Plaintiff was not put on
notice of the Customer Agreement, including its arbitration
provision.[26]  Pl. Mem. Opp. Compel 12.  Plaintiff also contends
that the arbitration provision is substantively unconscionable
because: 1) it replaces the applicable statute of limitations, of
three to six years, with a one-year limit for bringing claims; 2)
it eliminates the right to a jury trial; 3) it eliminates pre-
hearing discovery; 4) it eliminates the possibility of bringing
class actions; and 5) it precludes actions in small-claims court,
"mandating a costly arbitration process instead."  Pl. Mem. Opp.

---

[26] This overlaps with Plaintiff's initial claim that no
agreement to arbitrate exists because he was not on notice of the
Customer Agreement generally, and of the Agreement's arbitration
provision more specifically.

Compel 12.

The Court must, again, first determine who must decide these
claims of unconscionability.  Plaintiff's procedural
unconscionability argument, see Pl. Mem. Opp. Compel 12, could be
understood to pertain to the entire Customer Agreement.  Cf. JLM
Indust., Inc. v. Stolt-Nielsen SA, 387 F.3d 163, 169-70 (2d Cir.
2004) (understanding the argument of the plaintiffs – who argued
that the arbitration provision in the standard form contract at
issue should not be enforced – to be that the entire contract,
rather than only the arbitration clause, was a contract of
adhesion, based on an affidavit submitted by plaintiffs stating
that, because vessel owners "all use a standard form charter . .
. 'every charterer has to accept arbitration or they will not be
offered a ship'" and that therefore plaintiffs "'have no choice
but to accept the arbitration clauses that are printed in the
form contract'").  Although Plaintiff focuses only on the
arbitration provision as being unconscionable, Plaintiff's
allegations regarding Defendant's monopoly position, Plaintiff's
lack of meaningful choice, the resulting disparity of power
between the parties, and Defendant's ability to "dictate contract
terms" – as well as Plaintiff's argument of lack of notice
concerning the Customer Agreement – pertain to the Customer
Agreement generally, rather than specifically to the arbitration
clause.  To the extent that Plaintiff's argument may be viewed as
a challenge to the validity of the entire Customer Agreement, it

must be decided by an arbitrator.  See Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 403-04 (1967); Buckeye Check Cashing, Inc. v. Cardegna, 126 S. Ct. 1204, 1209 (2006); JLM Indust., Inc., 387 F.3d at 170.

Plaintiff's claims of procedural unconscionability could be understood, however, as pertaining specifically to the arbitration provision; furthermore, Plaintiff's claims of substantive unconscionability clearly pertain specifically to the arbitration clause.  As such, these claims of unconscionability would generally be decided by a court.  But, here, issues of arbitrability, including the validity of the arbitration agreement, have been referred to the arbitrator – suggesting that the unconscionability claims should be decided by the arbitrator. A further question arises, however: can the provision referring arbitrability issues to an arbitrator be enforced if the arbitration clause is unconscionable?  A defense of unconscionability may invalidate an arbitration agreement, Doctor's Assocs., Inc. v. Casarotto, 517 U.S. 681, 687 (1996); generally, "questions of contractual validity relating to the unconscionability of the underlying arbitration agreement must be resolved first, as a matter of state law, before compelling arbitration pursuant to the FAA," Cap Gemini Ernst & Young, U.S., L.L.C. v. Nackel, 346 F.3d 360, 365 (2d Cir. 2003).  Therefore, out of an abundance of caution, the Court will address Plaintiff's unconscionability claims here.

44

Under New York law, "[a] determination of unconscionability generally requires a showing that the contract was both procedurally and substantively unconscionable when made – i.e., 'some showing of an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.'" Gillman v. Chase Manhattan Bank, 73 N.Y.2d 1, 10, 537 N.Y.S.2d 787, 534 N.E.2d 824 (1988) (quoting Matter of State of New York v. Avco Fin. Serv., 50 N.Y.2d 383, 389, 429 N.Y.S.2d 181, 406 N.E.2d 1075 (1980); further internal quotation marks and citation omitted).[27] Accord Brower v. Gateway 2000, Inc., 246 A.D.2d 246, 253, 676 N.Y.S.2d 569, 573 (1st Dep't 1998). "The procedural element of unconscionability requires an examination of the contract formation process and the alleged lack of meaningful choice," focusing on factors such as "the size and commercial setting of the transaction, whether deceptive or high-pressured tactics were employed, the use of fine print in the contract, the experience and education of the party claiming unconscionability, and whether there was disparity in bargaining power." Gillman, 73 N.Y.2d at 10-11 (citations omitted). Ultimately, the purpose of the unconscionability doctrine "is to prevent oppression and unfair surprise, not to readjust the agreed allocation of the

_____

[27] However, "there have been exceptional cases where a provision of the contract is so outrageous as to warrant holding it unenforceable on the ground of substantive unconscionability alone." Gillman, 73 N.Y.2d at 12.

risks in the light of some perceived imbalance in the parties'
bargaining power." Id. at 13-14 (citing Avco Fin. Serv., 50
N.Y.2d at 389). See also Doctor's Assocs., Inc. v. Stuart, 85
F.3d 975, 980 (2d Cir. 1996) ("The purpose of the
unconscionability doctrine is to prevent unfair surprise and
oppression.") (internal quotation marks and citation omitted).

The Court does not find the arbitration provision at issue
here to be unconscionable. First, Plaintiff's argument regarding
lack of adequate notice has already been discussed at length
supra and been found to be without merit. Furthermore, Plaintiff
has not provided any evidence that he could not obtain high-speed
Internet service from another provider. "It does not avail
plaintiff to argue that the arbitration provision is
unconscionable without offering evidence that he could not have
chosen another service provider," Ranieri v. Bell Atlantic
Mobile, 304 A.D.2d 353, 354, 759 N.Y.S.2d 448, 449 (1st Dep't
2003).[28] Finally, "[m]ere inequality in bargaining power . . .
is not a sufficient reason to hold that arbitration agreements
are never enforceable," Gilmer v. Interstate/Johnson Lane Corp.,
500 U.S. 20, 33 (1991), as Plaintiff himself recognizes, see Pl.

----

[28] Plaintiff offers no support for his conclusory allegation
that "upon information and belief, Time Warner has been able to
function as a monopoly in the area of cable modem services," Pl.
Mem. Opp. Compel 12. Furthermore, even if Plaintiff's allegation
were supported, Plaintiff does not show that he could not obtain
a relatively comparable high-speed Internet service from another
type of provider.

Mem. Opp. Compel 12.

Plaintiff's claims of substantive unconscionability – for which Plaintiff provides no legal support – are unfounded.  See 1) as to replacing the statute of limitations with a one-year limit: Blends, Inc. v. Schottland Mills, Inc., 35 A.D.2d 377, 379, 316 N.Y.S.2d 912, 914 (1st Dep't 1970) (upholding one-year period of limitation incorporated in arbitration clause), aff'd, 29 N.Y.2d 575, 272 N.E.2d 892, 324 N.Y.S.2d 308 (1971); 2) as to eliminating the right to a jury trial: Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 31 (1991) (the fact that arbitration proceeding provides more limited discovery is not a ground for invalidating the arbitration agreement)[29]; 3) as to eliminating pre-hearing discovery: Ciago v. Ameriquest Mortgage Co., 295 F. Supp. 2d 324, 331 (S.D.N.Y. 2003) (implicit waiver of jury trial does not invalidate an arbitration agreement); In re Ball (SFX Broadcasting Inc.), 236 A.D.2d 158, 162, 665 N.Y.S.2d 444, 447 (3d Dep't 1997) (finding that right to jury trial may be waived by consenting to arbitration)[30]; 4) as

---

[29] Cf. Postlewaite v. McGraw-Hill, Inc., No. 98 CIV. 0611, 1998 WL 751687, at *4, 1998 U.S. Dist. LEXIS 16885, at *10-*11 (S.D.N.Y. Oct. 28, 1998) (finding that arbitral award should not be vacated on the ground that arbitrator denied some of petitioner's pre-hearing discovery requests).

[30] See also Kabia v. Koch, 186 Misc.2d 363, 368, 713 N.Y.S.2d 250, 254 (N.Y. Civ. Ct. 2000) ("Arbitration is a legally legitimate means to resolve disputes because it neither unlawfully deprives a party of access to the courts nor divests them of the constitutional right to trial by jury as these rights are waivable and the agreement to arbitrate waives them.")

to eliminating the possibility of bringing class actions:
Tsadilas v. Providian Nat. Bank, 13 A.D.3d 190, 191, 786 N.Y.S.2d
478 (1st Dep't 2004) (holding that "[t]he arbitration provision
is enforceable even though it waives plaintiff's right to bring a
class action" because "[u]nder New York law, 'a contractual
proscription against class actions . . . is neither
unconscionable nor violative of public policy'" (quoting Ranieri,
304 A.D.2d at 354)); 5) as to precluding actions in small-claims
court and allegedly "mandating a costly arbitration process
instead": Tsadilas, 13 A.D.3d at 191 (rejecting plaintiff's
argument that the arbitration agreement should be invalidated on
the basis that it "exposes her to potentially unaffordable fees,"
because "'[t]he 'risk' that [plaintiff] will be saddled with
prohibitive costs is too speculative to justify the invalidation
of an arbitration agreement.  To invalidate the agreement on that
basis would undermine the 'liberal federal policy favoring
arbitration agreements'"") (quoting Green Tree Fin. Corp.-Alabama
v Randolph, 531 U.S. 79, 91 (2000)).[31]  Furthermore, none of

_____

(citing Berkovitz v. Arbib & Houlberg, 230 N.Y. 261, 130 N.E. 288
(1921)).

   [31] Plaintiff has provided no indication of what he believes
the likely arbitration costs to be.  Furthermore, insofar as the
arbitration provision specifically refers to the AAA, Plaintiff
"could have inquired about the typical fees charged by the AAA
and its arbitrators."  Stuart, 85 F.3d at 981.  Moreover,
Plaintiff's complaint that the arbitration clause bars him from
bringing his action in small-claims court is particularly
unpersuasive in light of the fact that Plaintiff brought this
action in this Court.

these terms is "grossly one-sided," as Plaintiff claims, Pl. Mem. 11; they affect both parties.

## V. Conclusion

For the reasons stated above, the Court grants Defendant's motion to stay the proceedings and compel arbitration.

The Clerk of the Court is directed to close this case.  Any pending motions are moot.

SO ORDERED.

Dated:    New York, New York

October 16 , 2006

Kimba M. Wood

Kimba M. Wood

United States District Judge

49